[Cite as *State v. Mahe*, 2017-Ohio-7516.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | C.A. CASE NO. 27309 |
| | : | |
| v. | : | T.C. NO. 16-CRB-5321 |
| | : | |
| GUSTAVO MAHE | : | (Criminal Appeal from |
| | : | Municipal Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . .

**O P I N I O N**

Rendered on the ___8th___ day of _____September_____, 2017.

. . . . . . . . . .

GARRETT P. BAKER, Atty. Reg. No. 0084416, Assistant City Prosecutor, 335 W. Third Street, Rm. 372, Dayton, Ohio 45402
        Attorney for Plaintiff-Appellee

KAREN DENISE BRADLEY, Atty. Reg. No. 0066141, 130 W. Second Street, Suite 1818, Dayton, Ohio 45440
        Attorney for Defendant-Appellant

. . . . . . . . . . . .

DONOVAN, J.

{¶ 1} This matter is before the Court on the Notice of Appeal of Gustavo Mahe, filed October 20, 2016. Mahe appeals from his September 20, 2016 judgment entry of conviction on one count of assault, in violation of R.C. 2903.13(A), and one count of domestic violence, in violation of R.C. 2919.25(A)(1), both misdemeanors of the first

degree. After merger, the State elected to proceed to sentencing on the domestic violence offense. The municipal court sentenced Mahe to 180 days, suspended 134 days, and gave Mahe credit for 46 days. Mahe was further sentenced to 18 months of intensive supervision and ordered to have no contact with the victim, J.R., his former girlfriend. Mahe was also fined $250.00 with $100.00 suspended. We hereby affirm the judgment of the trial court.

{¶ 2} Mahe was charged with the above offenses on August 7, 2016, and he pled not guilty on August 8, 2016. On September 13, 2016, Mahe filed a "Jury Demand," which the State opposed on September 14, 2016, asserting that Mahe waived his right to a trial by jury. On September 14, 2016, Mahe filed "Defendant's Motion in Limine Re: Video Tape," seeking to exclude video evidence of the incident taken from surveillance cameras in the parties' home and provided to the State by J.R. On September 19, 2016, the court overruled Mahe's jury demand as untimely.

{¶ 3} At the start of trial, the court addressed Mahe's liminal motion. Defense counsel asserted that she filed the motion because the videotape at issue was "from a motion sensor video and only portions of it were provided. There is a significant bit that was left out, so it is our position that the video should be kept out because any exculpatory evidence that would have been shown has been purposefully deleted, is no longer available and is an inaccurate portrayal of the events that happened that day." The State responded that J.R. "is expected to testify about how the machine works, how it records, how she obtained that video, and her involvement in any deletion or alteration of the video and we would expect that after laying that foundation the court would find * * * that it should be admitted for the court's consideration." The trial court indicated that it would

"allow testimony regarding the system, how it works, and then I'll make a final decision as to whether or not that is enough for me to believe that this fairly and accurately represents what took place."

{¶ 4} J.R. testified through an interpreter that she has known Mahe for a year and half, and that they had been in a romantic relationship. She stated that on the date of the offenses, August 6, 2016, she and Mahe resided together on Monmouth Street. J.R. testified that she and Mahe shared household responsibilities and expenses in the home. According to her testimony, J.R. contacted the Dayton Police Department around 10:00 p.m. on the date of the incident after Mahe "pushed me, hit me, and tried to choke me." She stated that she and Mahe had argued verbally for five minutes about "jealousy" prior to the attack, and that she did not threaten Mahe in the course of the argument. J.R. testified that Mahe initially pushed her in the living room with both hands on her shoulders, causing her to fall back onto a couch. She stated that at the time he "was saying bad words like I was a whore." J.R. testified that Mahe then began choking her with both hands, and that she put her hands on him for the first time in an attempt to defend herself. She stated that she was able to breathe "a little bit," and that he was hurting her. She stated that Mahe accused her of cheating on him, and that she "tried to get away" and "to get him to get off." J.R. stated that Mahe then hit her on both sides of her face with his fist, and that she "screamed for somebody to listen and I told him to go away." She stated that the blows were painful. J.R. stated that Mahe left the home after hitting her in the face.

{¶ 5} J.R. testified that it took police officers ten minutes to arrive at the home, and that she told them what happened. She stated that they photographed her, and she

identified three photographs which she testified depict redness on her left and right cheeks, redness on her chest and neck, and a mark on her lip as a result of the attack.

{¶ 6} J.R. testified that she has two cameras in her living room for security due to a previous theft at her home. She stated that the cameras had been there for two months before the incident, and that Mahe knew the cameras were there. According to J.R., the cameras are battery-operated and connected to WI-FI, and she monitors them through her cell phone. She stated that they operate 24 hours a day, and that they begin recording when they detect motion. J.R. stated that if you don't "unload" the recordings, they will be erased.

{¶ 7} J.R. testified that she looked on her phone for the recording from the two cameras after the police left her home. She testified that she downloaded the entire video that was on the system to her phone, and that she did not cut or erase any part of it. J.R. testified that she sent the entire recording to the prosecutor the next day via email, without editing or altering it in any way.

{¶ 8} The State then asked the court for permission to play the videotape that the prosecutor received via email from J.R. over Mahe's objection. In response to questioning by the court, J.R. stated that the original recording remains on her phone, which she brought to court with her. The court then indicated that it wanted to compare the video received by the State to the video on J.R.'s phone. After doing so, the court indicated that "they look the same to me." Counsel for Mahe then acknowledged that "they appear to be the same as the ones the prosecutor has provided but again it still is not a full picture of the evening." The court indicated that the State could question J.R. about the video "and then the weight of the video will depend on all the other testimony."

J.R. testified that the video does not depict the entire incident from beginning to end "because it only detected the motion," but that the video accurately depicts what happened on the night of the incident. The court admitted the photographs of J.R. taken by responding police officers without objection, as well as the video, over objection.

{¶ 9} On cross-examination, when asked about her testimony about "jealousy," J.R. testified that the argument involved her job, and she stated that she works "on slot machines and they require me to sell machines internationally so I have to talk to people that speak Spanish and he thinks that I'm going with them." She stated that when Mahe held her down on the couch she tried to bite him. She stated that she did not tell the police about the video because she was nervous and scared at the time and "didn't remember about it."

{¶ 10} J.R. testified that she is in this country on a student visa from Mexico. She stated, "right now I am working but I will go to school pretty soon." She stated that she last attended school in 2011, "* * * and I was studying to be a nurse but I got out because of economical [sic] problems." J.R. acknowledged that she is "out of status" since she is not currently in school. The following exchange occurred:

Q. Is it your intent to become a permanent resident of this country?

* * *

A. Yes.

Q. Do you have any plan on how you are going to do that?

THE STATE: Your Honor, I'm going to object. We are getting into stuff that's not going to her motive. This is getting beyond motive.

THE COURT: Yes, I agree. I would sustain.

* * *

Q. Are you aware of the visa process for prosecuting a crime?

A. Yes.

Q. Have you tried to do that before with your ex-husband?

A. No, I believe that like a student I cannot arrange that, like to become a resident [sic].

Q. Were you married to [I.A.]?

A. Yes.

Q. Was there a domestic violence charge against him?

A. No.

Q. Were there any violent charges against him?

THE STATE: Your Honor, I'm going to object. I don't know the relevance of a previous relationship and someone that didn't have criminal charges as regarding this defendant and this case.

THE COURT: Counsel, what's the relevance?

THE DEFENSE: Your Honor, we believe her motive is to get the green card through pursuing this case.[1] We would show that she has tried to do that in the past. She has testified that she knows about that process. She is familiar with it and we believe that goes to her motive in this case.

---

[1] We note that the docket reflects the following entry on October 21, 2016: "A U Nonimmigrant Status Certification, presented on [J.R.'s] (victim) behalf, was mailed to Atty. Varun Luthra on 10/21/16/." Appellant suggests obtaining a visa motivated J.R. to fabricate her story in order to remain in the United States. However, this argument that a U visa would necessarily permit J.R. to live and work legally in the United States is not established on this record. Furthermore, the trial court ultimately found J.R. credible.

THE COURT: Overruled, I'll give you some leniency.

Q. Has your husband ever been arrested for charges against you?

A. No.

Q. How long did you say it took you to get the video to the prosecutor in this case.

A. Like five hours.

Q. So as you sit here today there is no way that you can gain access to that full video from August sixth?

A. Yes, I cannot.

{¶ 11} On redirect examination, J.R. stated that the video cameras normally record if someone is sitting in the living room or walking through the room. She stated that she and Mahe were standing "closer to the TV" when they initially argued.

{¶ 12} The following exchange occurred on re-cross examination:

Q. So you were arguing in front of this TV?

A. Yes.

Q. When you got over this way did you go on this side of the table or around this way?

A. The backside.

Q. Back here?

A. Yes.

Q. Okay, which is in full view of this camera, correct?

A. Yes.

Q. Where is the other camera located in this picture?

A.   Up there where the light is.

Q.   This is the second camera?

A.   Yes.

Q.   So does this second camera show, would it show you passing through?

A.   Yes.

Q.   But you don't have that video?

A.   No because I did not upload it, it got erased.

Q.   Did you ever see it?

A.   Yes.

Q.   Okay, so you saw that video but you didn't save it and then it got erased?

A.   Yes.

Q.   Did you show that video to the prosecutor?

A.   I showed her some video.   I think it was the three and she said okay, you send, send it to me.

Q.   Okay. So you didn't show her the video that's not here today?

A.   No.

Q.   But you saw it?

A.   Yes.

**{¶ 13}**  On re-direct examination, the following exchange occurred:

Q.   Defense counsel asked you about not showing the video to the prosecutor, what did that video show when you saw it?

A. It show [sic] when I was walking but I didn't thought [sic] that that would be an offense that's why I didn't download it.

{¶ 14} Mahe next testified that he and J.R. argued after a trip to the mall with her young children, after Mahe failed to wait for J.R. to walk together to the mall from the parking lot. After they returned home, according to Mahe, J.R. remained angry and Mahe decided to leave the home because he did not want to argue. After he obtained the car keys, Mahe testified that J.R. told him to "take all your stuff because I don't want you living here anymore." Mahe testified that when he asked J.R. why she was "saying all this" after a trivial argument about what occurred in the parking lot, J.R. then hit him. The following exchange occurred:

Q. Okay and then what did you do?

A. I was hit, she grabbed me by the arm and scratched my arm. So then when she grabbed me, I grabbed her hand and I put her on the sofa and said calm down, I'm not hitting you, you're hitting me. She was very mad. She wasn't acting reasonable. I grabbed her by the arms and she was screaming let go, let go of me. I said I don't want to let go of you because you are hitting me. If I let you go you are going to keep hitting me.

Q. Did you have marks on your arms?

A. Yes.

Q. Did you have marks on your face?

A. No.

{¶ 15} Mahe stated that J.R. tried to bite his hand while he held her arms. When

asked if he ever hit J.R., Mahe responded, "No, I grabbed her. You can see in the video I was trying to grab her hands. I never gave her a hit or a punch or anything. You see on the video. My hands were always trying to grab her arm." Mahe stated, "When she bit my hand I let go of her, I said you happy now, you bit my, you scratched my arms and you bit my hands." He stated that he then left the residence. On cross examination, Mahe stated that he advised the officer who eventually detained him that he had been scratched on the arm by J.R., but that no photographs were taken of his arm.

{¶ 16} After watching the video again, the court indicated as follows:

Both the State and the defense has put much emphasis on these three video clips and I will tell you that they have no bearing on my decision. I find that it's very suspect that there's a lot of activity going on in the household and there is no beginning and no end, just snippets, and so the video in terms of me thinking that this is the entire video, I, I just don't agree with that. I do however find the complainant very credible in terms of how this progressed and how the argument progressed into something physical and who started the physical altercation. For that reason I will make a finding of guilty on the assault and guilty on the domestic violence charge.

{¶ 17} Mahe asserts two assignments of error herein which we will consider together. They are as follows:

DEFENDANT'S CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE,

And,

THE COURT WRONGLY WEIGHED THE CREDIBILITY OF THE

WITNESS, [J.R.].

{¶ 18} Mahe asserts that J.R. "did not provide the full video of the day's event and only provided clips of the video after reviewing them herself." He asserts that J.R. deliberately recorded the altercation, and that she "had about 8 hours to view, edit, and otherwise control the video that she wanted to use as evidence in this case and present to the prosecutor's office." Mahe asserts that J.R.'s "testimony clearly demonstrates that there were videos that she saw, yet failed to download them and did not show them to the prosecutor."

{¶ 19} Mahe notes the trial court's comments regarding the video and its "suspect" nature. He asserts that "the full video was not downloaded by the witness," and that J.R. "lied on the stand about this fact. As mentioned above, the witness was inconsistent as to the number of videos that she recorded, the number of videos that she saw and the ones that she selected to show the prosecutor for evidence." Mahe further asserts that J.R. "lied on the stand as to her status in the United States." Mahe argues that J.R. acknowledged that she is aware of the visa process for prosecuting a crime, and that this "is clear evidence that Ms. [J.R.] is undocumented in the United States and that she has a motive and intent to lie on the stand and pursue the prosecution of appellant for domestic violence, in order to seek and obtain a U visa."

{¶ 20} As this Court has previously noted:

The weight of the evidence concerns the inclination of the greater amount of credible evidence offered to support one side of the issue rather than the other. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). When presented with a challenge to the manifest weight of the

evidence, an appellate court may not substitute its view for that of the trier of fact, but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Id.* at 387. "A judgment should be reversed as being against the manifest weight of the evidence 'only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Id.,* quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist. 1983).

In *State v. Vencill*, 10th Dist. Franklin No. 11AP-1050, 2012-Ohio-4419, the Tenth District Court of Appeals observed that:

> In addressing a manifest weight of the evidence argument, we are able to consider the credibility of the witnesses. *State v. Cattledge*, 10th Dist. No. 10AP-105, 2010-Ohio-4953, ¶ 6. However, in conducting our review, we are guided by the presumption that the jury, or the trial court in a bench trial, " 'is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' " *Id.,* quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). Accordingly, we afford great deference to the trier of fact's determination of

witness credibility. (Citations omitted).

*Vencill,* at ¶ 11.

*State v. Stevenson*, 2d Dist. Montgomery No. 26583, 2016-Ohio-321, ¶ 8-9.

{¶ 21} R.C. 2903.13(A) provides that "[n]o person shall knowingly cause or attempt to cause physical harm to another * * *," and R.C. 2919.25(A) provides that "[n]o person shall knowingly cause or attempt to cause physical harm to a family or household member."

{¶ 22} Having thoroughly reviewed the entire record, we cannot conclude that the trial court lost its way and created a manifest injustice requiring a new trial. The court specifically indicated that the video evidence presented had "no bearing on my decision," since it merely contained "snippets" of the incident. The court further specifically found J.R. to be "very credible in terms of * * * how the argument progressed into something physical and who started the physical altercation." We note that the court was free to credit some, all, or none of the testimony of both J.R. and Mahe, and we afford great deference to the trial court's specific assessment of J.R.'s version of the physical altercation as credible. In other words, this is not an exceptional case where the evidence weighs heavily against Mahe's convictions for assault and domestic violence, since J.R. testified credibly that Mahe pushed her, choked her, and hit her in the face after an argument, harming her in the process. Accordingly, Mahe's assigned errors are overruled. The judgment of the municipal court is accordingly affirmed.

. . . . . . . . . . . . .

HALL, P.J. and TUCKER, J., concur.

Copies mailed to:

Garrett P. Baker
Karen Denise Bradley
Hon. Deirdre E. Logan